The next case on this morning docket is the case of the estate of Finnell, deceased, versus Gene K. Landers. And we have Mr. Todd Matthews, Megan Myers for the appellant. And we have Mr. Ryan Robertson for the appellee. And are you both going to argue, or just Mr. Matthews? Okay, you may proceed, Mr. Matthews. Well, let me make a statement for the record before you do. Obviously, I'm here alone, and I don't know if you were here earlier when I made a similar statement, so I just need to put it on the record because we do have a recording of this. Due to unforeseen circumstances, my other two colleagues were not able to attend today's oral arguments. However, they have read the briefs, and they will be privy to the auditory tapes. So with that said, and I think that you were alerted to this fact beforehand, you may proceed. Thank you, Your Honor. You're welcome. May it please the Court? I, in reviewing or preparing for today's argument, I don't want to do a disservice to the late Gail Renshaw, who provided the initial briefing in this, nor the efforts of Ms. Myers. If it would please the Court, I would be happy to answer any questions the Court may have, or I can simply present the argument that we have. I don't know that I have questions right off the top of my head, so you can proceed with however you wish to. I know I felt a little emotional when I read that. It was very sad. Certainly. However you want to proceed, if you just want to rely on the brief, that's fine. No, I'll be happy to make some amendments. Okay. The Court may recall from reviewing the briefs, this is a matter of Jean Landers, the appellant in this matter, who was taking care of her stepfather, the stepfather that she had had for 30 years prior to his passing in 2010. The issue before the Court, and there's really two before the Court, did the trial court error in finding that a fiduciary relationship existed between Ms. Landers and Mr. Kittle prior to his death? And if so, if there was a fiduciary relationship, did the Court fail to apply the clear and convincing standards that are present with the Court? This has to be reviewed de novo as it's an application of the law, the clear and convincing standard that we are taking exception to. In this case, there was testimony, there was evidence presented that attempted to show a clear and convincing standard, but it just failed to reach that level. The Court looked at numerous factors in attempting to establish whether there was a fiduciary relationship. But in setting those standards, it operated in direct conflict with what the Supreme Court said, that there shouldn't be set precise boundaries. And so in analyzing the factors of degree of kinship, disparity in age, health, mental and emotional factors, and business experience, the Court didn't analyze that at all in looking towards whether Ms. Landers exerted dominance and influence through those factors. So we take exception with trial court's ruling and believe that the standard just simply wasn't shown. There was not a fiduciary relationship. Obviously, she was the stepdaughter. She took care of her mother and Mr. Kittle as they advanced in age, like most of us do as our parents advance in age. She spent 30 years with his mother as a stepfather. Her mother passed away about four months prior to Mr. Kittle passing away. So just as she had taken care of him and helped them, she did the same with him. So the fact that she was a stepdaughter just doesn't quite show dominance or influence in any way. Obviously, he was much older than her. There was this disparity in age. But again, she is the stepdaughter. She is simply there helping and assisting her family. The health of Mr. Kittle was brought up. However, there was no evidence showing that he had ever been deemed incompetent, that he had been deemed unable to take care of himself. He was living at an assisted living facility that allowed him to come and go. He could drive. What was his age? I don't think I saw that anywhere. I'm sorry, Your Honor. I don't have that information. Okay. It will be in the record, I presume? Absolutely. Perhaps the counsel knows. I want to say 85, but I can't guarantee that. I was going to tell the court 86, so we're in the wrong. I think we're close enough. Okay. As to the issues of health, Mr. Kittle was never deemed unable to take care of himself by any medical doctor. His mental and emotional status was brought up. He lost his wife, but he was never diagnosed with depression. He was never diagnosed as a – he was never admitted to a mental facility. He was never even – he was at an assisted living facility. He could actually get in his car and drive, as he did in this case. Mr. Kittle gets in his car while he's living at the assisted living facility, drives to the bank that he's banked at for years, and presents the bank with a CD for $100,000. That was his and his wife's prior to her passing. He received it in joint tenancy. He cashes that CD, gets a cashier's check, drives to another bank, and deposits it into an account. So he had his mental faculties with him. He knew what he was doing. He had the ability to make decisions. And so there was no evidence at all of mental or emotional status affecting his ability to make decisions, and it certainly didn't prove that she was exerting dominance or influence over him. The last factor the court considered was business expertise of the parties. There was absolutely no evidence that Ms. Landers possessed some heightened experience with business relationships. In fact, the facts show that Mr. Kittle had held his home as tenants in common with his wife. He'd had her bank accounts with her as joint tenants. He knew the difference in how to hold real estate, how to hold accounts, and so whenever he goes and instructs her when he's admitted into the hospital in late July to go to the bank and get some paperwork that the bank had prepared for him and bring it to him, he knew that he was asking the bank to prepare documents to allow her to be added to this bank account, that he knew that it was joint tenancy. He knew that upon his death, that money, what was left in there, would revert to her. He knew all these things. He asked her to go do that. She didn't go do that. He asked her to go do that. He worked with her day in and day out, and she would see him, I believe the testimony was a few times a week. They would work on his bills. He would tell her what to pay. He would tell her, go check on the house. Go check to make sure they're mowing the house. He had his faculties up until the day he passed. There's absolutely no proof of dominance or influence by her over him. And so a fiduciary relationship should have never been found in this case. There just weren't any facts to support it, and the court misapplied law that requires a clear and convincing show in order to show the fiduciary relationship. So the court then turns to the issue of was it a convenience account. This account was an account that had been held by Mr. and Mrs. Kittle prior to her death as joint tenants. It then reverts to him upon her death. He goes into the hospital about nine days after she passes away, and Ms. Landers is taking care of Mr. Kittle, coming to see him, check on him, make sure he's doing okay. He arranges for the bank to do this paperwork for him. She signs off. She doesn't even know what she's signing. He then explains to her that it's a joint tenancy and that he wants her to have the remains of whatever's left after he's no longer with them. She then takes that paperwork back to the bank. Several days later, he gets out of the hospital. He's back at his assisted living facility. That's when he goes and cashes in a CD and takes it to the bank where the joint tenancy account is and deposits the money. Now, he knows. He's well aware of the fact at that point that not only can he sign off on the account, but she can. He's deposited $100,000 in an account that's had $10,000 to $15,000 in it to take care of his expenses. He deposits $100,000 knowing she can write checks on that account. They continue to pay his bills back and forth during that time. In order for there to be a convenience account, there are certain presumptions that come into play. If you deposit money into a joint tenancy account, there is donative intent there, and that has to be overcome by a clear and convincing finding. They simply can't do that in this case. Well, it seems to me that they attempt to show that by the fact that she only did use the money for things related to the care of Mr. Kidd. Certainly, and the case law seems to indicate that it's not only— you don't look just at that factor as to what they were spending it on at the time. There can be a future intent to that money, and that was certainly— and there was an offer of proof at the trial, court level, on this very issue, where at the time that he has her sign this paperwork to get put onto the account, they have a conversation, and he says to her, I want you to be just like my wife was on this account and to have whatever's left whenever I pass. And when you say there was an offer of proof, that was kept out of evidence? Well, from the reading of the transcript, the court first said, no, that's not coming in, so they made an offer of proof, and then the court never ruled on the offer of proof. So in my reading of the transcript, it's what we've picked up there. So for there to be a convenience account, they certainly simply didn't meet the burden, and the court didn't apply the correct standard in finding whether there was or was not a convenience account. They ultimately found that there was. We believe that the court showed just a misapplication of facts in this case in applying the law, that they never should have gotten to the point of determining a convenience account because there was never a fiduciary relationship. We further go into this issue of the convenience account whenever you look at the presumptions of fraud. And if there was a fiduciary relationship, then you say there's a presumption of fraud. Well, that presumption of fraud you never get to if you start looking at the timing of these issues. And the timing of the issues really comes down to was there first a joint account or was there first a fiduciary relationship? And the court, in their initial evaluation of fiduciary relationship, puts a lot of weight on she was paying bills, she was helping him with his day-to-day, but then whenever they start looking at this issue of fiduciary relationship, they kind of backpedal from those issues and say the fiduciary relationship was created much earlier on than when she started paying these bills. But that doesn't gel with the logic of the court. Either there was or there wasn't a fiduciary relationship, and a set time would have to be determined for when that fiduciary relationship existed. They can't have it both ways. And that's, in essence, what the trial court has done. If the joint account was created first, therefore the presumption of donative intent is first, then you don't get to the fraud count. But if you show that there was a fiduciary relationship, then you get to the presumption of fraud. You have to look at those two things, and they cancel each other out. And then it's just a mere preponderance of the evidence. And we think even if there was a fiduciary relationship, it was much later than when the joint account was created, and we will concede that the joint account was created when she was placed on that account, not when him and his first wife created that account. But the fiduciary relationship, if at all, was much later, as he got closer in time to his death. But the testimony was clear that he made the decisions as to what was going to be paid. They sat down and said this bill needs to be paid, that bill needs to be paid, and she's simply signing off on the account. If he didn't have intent for this to be a joint account, he could have simply added her as a signatory, or he could have added her in any other way to that account but didn't give her the right of survivorship once he passed away. And he simply didn't do it. And he knew the details of those accounts because he'd just gone through it with his wife. He had just gone through this two weeks before. He knew that a joint account meant when one person passes, the other person has the right to that money. And so they just didn't meet the clear and convincing standards that are out there. There was no dominance or influence shown, and the trial court just simply applied the law wrong. And so we would ask that we believe it's just clear error that this case should be overturned. Okay. Thank you, Mr. Matthews. I love the opportunities that we've had. Mr. Robertson. May it please the Court, my name is Ryan Robertson, and I'm the attorney for the Applee, the estate of Emma Kittle. And I agree today there are two issues before this court. Well, the trial court heard two issues. One, whether there was a fiduciary relationship. And two, what was the donor's intent on the account? The first argument the appellant makes is to the standard of review of this court. And I contend the general rule is that even where a plaintiff has the burden to prove his or her case by clear and convincing evidence, the standard of review in the appellate court is whether the trial court's decision is against the manifest weight of the evidence. And a trial court's finding is not against the manifest weight of the evidence unless an opposite conclusion is clearly evident. They base their argument, the court first addressed the issue of fiduciary relationship. And they contend that he applied, the trial court judge applied the incorrect standard. I contend that he applied the correct standard. He simply used the term requisite standard instead of using the term clear and convincing standard. But when you look at the order, all the cases cited behind his requisite standard comment were cases that the appellant cited, I cited, all for clear and convincing standard. Each case had clear and convincing standard, and each case laid out relevant factors that the court must look at in order to determine if there was a fiduciary relationship. The court looked at those determinations or, yes, those determinations. The appellant laid out that the first was the degree of kinship, and I agree that's an easy one. She was a stepdaughter. He was her stepfather. There was a long-term relationship. The relationship, I will say, started well after all the kids had moved out of the house. This was a later life marriage, and she was the closest relative to the two. So degree of kinship was easy. Disparity in age, health, mental condition, education, and business experience. I view this a little differently. I think this is where the court did look at the disparity. Age, of course, she was much younger. She was a daughter, so I don't, again, think that was a big issue for the court. But disparity in mental capacity and physical capacity. My opponent has said that he lived most of his final days in an assisted living facility where he was free to come and go as he pleased. I don't believe that's correct. If you look at the record and the evidence, his wife passed away on July 19th. On July 28th, he entered the hospital and never went back home. There was 136 days from the date he went into the hospital, that initial time, until he passed away in December. Of that 136 days, 120 of those days were spent in a hospital, in a hospital room, in a hospital bed, where he was not free to come and go as he pleased. The remaining 16 days he spent between assisted living and a nursing home. Was there any evidence that he had a diminished capacity because of his age or any other reason? There was evidence in the record that he did, as was stated, fight bouts of depression. And he was, I believe, in the record, you'll also see, there were, we named the hospitals in the assisted living facility. And there was something called the Hatch Unit, which was... I'm sorry, called what? The Hatch Unit, which is a geriatric psychiatric unit at the hospital in which he was a resident too. You're saying that it was for both? He could be geriatric and be in the Hatch Unit? For depression and mental issues. Or was it just for somebody that was geriatric and also had... I think there, in the record, there may be bouts that he had with hallucinations at times. And I don't contend that he was, he needed a guardian or he was incapable of doing things on his own either. But I think the court, and I assume that if you're in the hospital for 120 days out of the 136 you have remaining, there are significant issues with what you can and cannot do. Well, I guess I'm not clear at all what those issues relate to, though. If they related to some physical impairment, that wouldn't necessarily affect his mental capacity. Well, I believe they involve physical as well as mental capacity. And then the evidence I presented at trial went to support that. Now, I did not have any doctors come in and claim that he was incapacitated and could not make decisions on his own. That is true. Okay. So we look at that. Then we have the business experience and education. And again, I think this is a very factual case. When he first got married to his new wife, they signed a prenuptial agreement indicating that they wanted to keep their assets separate. Secondly, they each executed wills which stated that they're leaving their possessions to their biological children. There was no cross, gifts, or anything. So as you can see at the beginning of this marriage, they had an idea of what they wanted to do, and that was preserve assets and those assets would be given to their biological children. That never changed at any time in this gentleman's life until the last four months of his life when he entered the hospital after his wife's death. Then it seems that his life planning, his estate planning, all of a sudden changes. And those changes only took place with the assistance of the defendant in this case. Now, refresh my memory. There's only one biological son of his? There's a son and there's a daughter, I believe. A daughter, okay. Yes. And then of his stepchildren, just one? Two daughters. Two daughters, step and son and daughter biological. Correct, Your Honor. Okay. So they argued that there wasn't a degree of influence or domination over Mr. Kittle. Well, as I said before, he never changed any of his estate planning until the very end of his life. His assets consisted of a $60,000 CD and a $100,000 CD as well as a checking account which had minimal money and a home. Well, they are correct. The defendant was added to the account after he went into the hospital. It was alleged that he called the bank, asked them to send him the cards that were necessary to execute. The defendant went to the bank and got them, brought them back, had them executed, and then took them back to the bank to put her on the account. There were two things. We brought up an expert witness in handwriting and in evidence in the record that was unrebutted. She calls into question those signatures. However, there was a witness that testified that she saw him come into the bank. Different time. Different time. This is when she was added to the account. Okay. When she was added to the account, she had to go to the bank, she had to pick up the information, bring it back to the hospital, have him executed, and then take it back to the bank. Those documents were questioned to their authenticity. And there was no rebuttal to that in the record. Now, you've clarified the children involved, but there was evidence, and I don't think it was rebutted, that this stepdaughter, Jean, was the essential caretaker. Is that correct? True. And that the son, I don't know about the other biological daughter, but the son did not live in the area, and I guess neither of his biological children were caretaking. Correct. That is true. He lived in Kentucky. He was not able to caretake, and so therefore she was. And there's evidence in the record from a few people stating how much dependence he had in the defendant also. And I think that all goes to whether there was a fiduciary relationship established. But it also could go to donative intent as well. Correct. It's not like she swooped in and... No, she did not. She had been there. But the swooping I contend was at the very end of his life when he hadn't changed any of his finance arrangements until he was in the hospital and at the very end. So once a fiduciary relationship is established, which I believe the court did find using claim-convincing evidence, which we presented, the burden shifts to the appellant. So the second issue was donative intent of the account. Okay? wanted the beneficiary to have it, which is true. But in order for me to prove my case, I also have to present claim-convincing evidence that the account was, in fact, an account of convenience. First, as you already mentioned to the other side, the money was solely used for the benefit of Mr. Kittle. The money was not used for any other purposes in that time period. Two, it is true that $100,000 were placed into the account, but at the time the money was placed into the account, the funds in the account were diminishing. He was looking at extended stay in either assisted living, a nursing home, or a hospital, which were going to incur lots of bills. So even if you look at $100,000 and you assume $5,000 or $6,000 a month in expenses of what he has medical, plus he owned a home still that had to be cared for that hadn't been sold, you're looking at a year and a half maybe of funds in order to support yourself. So to me it doesn't seem illogical that he would deposit that money into the account. Two, the $100,000 was from a CD, so you either have to redo the CD or you cash the CD out and take the money and use it for something else. So I'm assuming he was going to use the money for his care, so he didn't need to put it back into a CD and he put it into the account. True, again, you mentioned that she was the closest person to help, so she would be the logical choice that Mr. Kittle would choose in order to help her with these things. Oh, an important fact that we heard, that the trial court heard. This account was created and it did have a joint tenancy on it, but the joint tenancy account was created by no affirmative action on the part of Mr. Kittle. Mr. Kittle held this account with his former wife as joint tenants. When she passed away, it left it to him, payable on death, or joint tenants, so he owned the account funds. When he added his stepdaughter to the account, they simply filled, and there was testimony in the record from the banker that did it, that it was just auto-filled. There was no comment from Mr. Kittle that, yes, I want this to be a joint tenant, I understand that when I do do this, that she will be receiving the money once I pass. It was simply, the bank states, that it auto-fills the information from the previous document, and then they added her name, which also draws up the question, this was not a gift, this was simply a transaction. She was honored to assist him with his day-to-day needs, and that was it. Also, so once the court concludes that there is no note of intent, the burden switches to the defendant to prove by clear and convincing evidence that the account was in fact a gift. They had no evidence. The only evidence, well, basically the only evidence they have, which they mentioned, was her testimony claiming that he told her he wanted her to have the money. I objected to that at trial under the Hearsay Rule and the Dead Man's Act. It was the same. It's true they did offer it as an offer of proof, but it's my understanding that you have to go back at the end of the trial and ask for it to be admitted into evidence with the offer of proof, which no one ever did. So therefore, that shouldn't even be considered, or can't be considered, I don't believe. That was the linchpin of their argument. I take it your position is it shouldn't have been considered anyhow, even if preserved, because of the Dead Man's Act? That is true. It shouldn't. But that was the only thing, the only self-serving testimony that she had was that he wanted her to have this. Another bit of testimony that she presented was that he didn't like his son, again, a self-serving thing, in which the court looked at and reviewed her testimony and decided that didn't hold weight either, because there was testimony presented that the father didn't like him because he couldn't keep a job and he wasn't stable. Well, there was evidence in the record, which the judge heard, that proved that he had a job from the time he got out of college, through the military, through this trial. So he threw that out. Another argument that the appellant tried to use was that, at the beginning of their case, was that this money was actually from the mother, which the court even recognized in its order that it didn't go anywhere, it wasn't persuasive, and it was thrown out. So once the burden shifted to them, they didn't provide any proof whatsoever, clear and convincing or not or otherwise, that this account was to be theirs. There was a – I forgot to mention that also in the fiduciary relationship in the dominance, a $60,000 CD was cashed in shortly after – or shortly before the $100,000 was added to the account. Now, this money wasn't put into an account. It was simply a CD that he had, and it was payable upon death to his grandchildren. The defendant took that prior to his death, took it to the bank, added cash, and distributed it to those grandkids, which is fine. I have no problem because the money ended up getting to who it was supposed to be anyway. But the fact that she could go prior to his death and do such a thing does, at least under the trial court's thought, does express a degree of influence and dominance over a gentleman who is in the hospital, is in assisted living, is in a nursing home that has limited funds at the end of his life to use for his care. We don't know if he's going to live four months, two years, to get rid of a big chunk of his estate at that time. And again, I'm not arguing that it didn't go to the right people. I'm just arguing as to the dominance and influence that she did have. She took the money. She cashed it and gave it to the grandchildren. When you say dominance and influence, I'm trying to square that away in my mind. Was he aware of this or – We're not sure. We don't know. We're not sure. We also had to handwrite an expert exam in the signatures, and she called into question those signatures too. So the only information we have is that Mr. Kittle, which was self-serving again on the part of the defendant, told me to take this and take it to the bank and distribute it to the children. We don't have any evidence that anybody witnessed any of this. It's just self-serving testimony. But you will have to admit it does appear that she did not do anything untoward with any of the money apparently. She did not, but – and she didn't have to do anything untoward with any of the money. It's the fact that it wasn't supposed to be hers in the first place, and if she just bides her time and waits, well, then she receives the money. I understand that that doesn't negate your position, but I don't see how it bolsters your position either. That's my point. Well, true. And I don't know – are you talking about the $60,000? I'm talking about both, actually. Oh, both. Okay. Well, again, my only point with the $60,000 was that she took it from him prior to his death. And the issue for me is that what if he had needed that? And there's a look back period for Medicaid and everything where that money would have had to come back from the children in the first place. The fact is she took it, and she gave it away because she wanted to. Now, who's – these are grandchildren? These are grandchildren. And these are grandchildren of his biological children? No, these are grandchildren of the defendant. Well, not the defendant. The defendant's daughter and her sister's daughter-in-law, I believe. So children from the other – from his wife's side. So – but that's not before the court, even though you – No, that was not before the court. It was simply brought before the court to show there was an element of influence and that she – I mean, she helped him with his banking. She helped him with his home. She helped him with medical professionals. She helped him with his mail. She was ingrained in his life, and this was just another aspect of trust and confidence that he placed in her. And she was able to use that trust and confidence to take a document, have it signed, and take it to the bank. And was that CD entered into – or that account entered into before his wife died? Yes, that account was entered into before his wife passed, yes. Okay. So that was previous. I guess in the final comment, I'd just like to say that we would like this court to uphold the trial court's order. We believe that we have proved beyond – or by clear and convincing evidence that there was a fiduciary relationship. Taking it from that next step, it is – if there's a fiduciary relationship, any transaction that benefits the defendant is fraud or presumed fraud. And then she has the burden to prove otherwise by clear and convincing evidence. Even if you didn't look at it that way and I just went with donated intent and I had to prove clear and convincing evidence that there was – it was a convenience account, the burden again shifts to the defendant to prove by clear and convincing evidence that it was a gift. And in the record evidence, which I told you part of it should be stricken anyway, didn't arise to the level of clear and convincing evidence that would be needed to prove it was a gift or the fact that she didn't have a fiduciary relationship. I have nothing further unless you have any questions of me. I don't think so. Thank you very much, Mr. Robertson. Mr. Matthews, you have the Bible. Thank you, Your Honor. There's numerous things I want to respond to, but I want to get right to the issue of this $60,000 CD. And just to make it clear, this $60,000 CD was one that was held by Mr. and Mrs. Kittle prior to her death to be paid upon death of both of them out to Mrs. Kittle's grandchildren. It does appear she jumped the gun then. I don't disagree with that. The point I take exception to is this issue was dealt with in a previous lawsuit, and the court actually dismissed this based on race, judicata, and collateral estoppel issues from this present lawsuit. And so the issue in that previous lawsuit, as I understand it, was Ms. Landers prevailed on that issue, and the court said the right people got the money, the grandkids got the money. So the facts and even the details of that being evidence in this case and the court basing their opinion on facts concerning that previous CD really are irrelevant to what we're here talking about today. So I think that court basing their judgment on those facts is reversible error in and of itself. In addition to that, the court's judgment never once in regard to fiduciary relationship mentions that a clear and convincing standard has been met. Never once, and that's what they have to do. That's the law that has to be applied. Mention was made of all this time that Mr. Kittle spent in various medical facilities prior to his death. Well, the important dates to take a look at are while he was out of the hospital and living on his own, free to come and go as he pleased, he made decisions on his own. He got in a car and drove to the bank. When he got to the bank, he shows ID to them. The bank, who's known him for years, the testimony is the banker looks at his ID. She says in her opinion he knew what he was doing whenever he cashed out that CD. He, on his own accord, goes to another bank and deposits the money into his account, into this joint account. There's absolutely no evidence that there was any dominance exerted by her in him doing those transactions. There's not a single piece of evidence showing that. Back to the standard of the burden of proof, was there any statement by the court that they used the wrong standard? Was there? You're just saying. They never say clear and convincing. They do say the requisite standard, but they never go into a clear and convincing. You're saying they had to use those words. I certainly think it would be a lot clearer if they had. It's important to also note that during this time, they want to talk about his mental state, his emotional state. He was never diagnosed with any issues. There's no proof that he was in the hatch unit because he had any mental issues. And it's important to note that his son, Jack, who was the administrator of the estate, actually held the medical power of attorney. Ms. Landers never held the medical power of attorney. She didn't make medical decisions for him. The testimony was the only time she even attempted to interact with medical personnel would be when she talked to social worker a few times. So she wasn't making any medical decisions. If Jack Kittle thought that his dad had some sort of mental faculty issues, he had the ability to make those decisions for him and didn't. So there's no proof at all that Mr. Kittle was having mental issues or the inability to make decisions in the weeks and months leading up. They mentioned real quick about the handwriting expert. Well, the testimony involving this handwriting expert, who was attempting to give testimony on whether he signed these CDs or not, didn't know that he had a stroke that affected the right side of his body and he's right-hand dominant. She didn't know that he had that issue based on what she was looking at, which predated the stroke, and what he signed after the stroke. So that became kind of a red herring, if you will, of issue. We just believe that the court did not apply the right standard. There was absolutely no showing that fiduciary duty existed. They did not overcome their burden in proving that it was a convenience account. And so we never even get to the issues of fraud. So we'd ask, again, that the court overturn this judgment and allow this matter to proceed as needed. Thank you. Thank you all for your briefs and your arguments. We'll take the matter under advisement under ruling.